# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **ROBERT BEARDEN** | § | |
| | § | |
| **v.** | § | **CASE NO. 6:25-CV-166-KNM** |
| | § | |
| **P.O. RICKI BAKER** *et al.* | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. 30).  This case was initially referred pursuant to 28 U.S.C. § 636(b).  Doc. 3.  The case was transferred to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636.  For the reasons below, the Court **GRANTS** the motion for summary judgment.

## BACKGROUND

Plaintiff Robert Bearden initiated this action against the City of Palestine and police lieutenant, Ricki Baker, pursuant to 42 U.S.C. § 1983.  Doc. 1.  Plaintiff's operative complaint[1] alleges that Lieutenant Baker used excessive force against him in violation of the Fourth Amendment while responding to an incident on or around May 15, 2023.  Doc. 21.  Plaintiff also asserts a *Monell*[2] claim against the City, attributing Lieutenant Baker's alleged use of excessive force to policies of the City.  *Id.*  Plaintiff finally states, as Count III of the amended complaint, that the City is obligated to pay any judgment Plaintiff obtains against Lieutenant Baker, according to indemnification/vicarious liability principles.  *Id.*  Defendants moved for summary judgment on

---

[1]Plaintiff filed an amended complaint (Doc. 21) on January 13, 2026, which superseded Plaintiff's original complaint and rendered it a legal nullity.  *Ultravision Techs., LLC v. Eaton Corp. PLC*, No. 2:19-cv-00290-JRG, 2019 WL 11250161, at *1 (E.D. Tex. Nov. 8, 2019) (citing *La. Fiber Corp. v. Fireman's Fund Ins. Co.*, 105 F.3d 655 (5th Cir. 1996)).
[2]*See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Plaintiff's excessive force claim against Lieutenant Baker, asserting the defense of qualified immunity.[3]  Plaintiff filed a response and Defendants filed a reply.  Docs. 35 and 37.

Defendants' motion describes the events of the incident that occurred on May 15, 2023. Doc. 30 at 4–7.  According to Defendants, while out on patrol, Lieutenant Baker "observed what appeared to be a disturbance" in a shopping center parking lot.  *Id.* at 4.  Specifically, Baker observed a crowd of eight to ten people standing in the parking lot and that "several of the individuals were shouting obscenities and threatening another individual," identified later as Jeffrey Shelton.  *Id.*  Lieutenant Baker, initially the only officer present, attempted to de-escalate the verbal altercation by ordering the individuals in the group to separate.  *Id.*  Shortly thereafter, Officers Jeremy Jenkins and Justin Huddleston arrived to assist Baker.  *Id.* at 5.

While the officers investigated the basis for the altercation and attempted to de-escalate, Lieutenant Baker noticed Plaintiff "standing in front of Jeffrey Shelton in a combative stance pointing his finger at Shelton and shouting at him."  Doc. 30 at 5.  Baker ordered Plaintiff to step away from Shelton.  *Id.*  According to Defendants, "[Plaintiff] was noncompliant."  *Id.*  Multiple times, Lieutenant Baker escorted Plaintiff away from Shelton and the crowd.  *Id.* at 5–6.  Each time, Plaintiff waited until Baker's back was turned and then moved away from the location he was told to stand.  *Id.*  Finally, Lieutenant Baker "ordered [Plaintiff] to 'stop interfering' and 'move away.'"  *Id.* at 6.  He further instructed Plaintiff to stand by Officer Jenkins' patrol car while Baker continued investigating the altercation.  Doc. 30 at 6.  Instead, Plaintiff again followed Baker back to the group.  *Id.*

---

[3]Although Defendants also moved for summary judgment on Plaintiff's *Monell* claim against the City, Plaintiff has since voluntarily dismissed his *Monell* claim.  *See* Docs. 33 and 34.  Thus, Plaintiff's only remaining substantive claim is against Lieutenant Baker for use of excessive force.

When Lieutenant Baker realized that Plaintiff was, again, being noncompliant, he "placed his right hand on [Plaintiff's] right arm, and his left arm on [Plaintiff's] back, and they started to walk toward . . . where [Plaintiff] was instructed to stand." Doc. 30 at 6. According to Defendants, Plaintiff then "swung his elbow toward Baker, . . . pulled away from Baker's grip[,]" and "attempted to turn to face Baker in a confrontational manner." *Id.* In response, Lieutenant Baker pushed Plaintiff toward the patrol car and "attempted to grab [Plaintiff's] right arm near the shoulder" to regain control over him. *Id.* Plaintiff subsequently lost his balance and fell to the ground. *Id.* While Plaintiff was on the ground, Lieutenant Baker "placed [Plaintiff] under arrest" and, with the help of Officer Jenkins, "attempted to place [Plaintiff] in handcuffs." *Id.* Defendants represent that Plaintiff kept his left arm pinned under his body, which required the officers to pull Plaintiff's arm out from under him and behind his back to place the handcuffs on him. *Id.* Once the officers successfully handcuffed Plaintiff, they raised him back up to a standing position. Doc. 30 at 6–7.

In his response, Plaintiff disputes Defendants' rendition of the facts. First, Plaintiff states that although he did speak with Shelton at one point, "they were not yelling, aggressive, or violent." Doc. 35 at 6. Plaintiff next disputes that Lieutenant Baker escorted him away from the scene multiple times before using force. *Id.* Plaintiff represents instead that "Baker only escorted [Plaintiff] one time . . . before Baker violently pushed [Plaintiff] down during the second time he escorted [Plaintiff]." *Id.* Plaintiff also states that he complied with Lieutenant Baker's instructions; was not hostile, threatening, or using foul language; and did not, as Defendants claim, resist arrest by hiding his left arm under his body. *Id.* at 6–8. Plaintiff finally claims that Lieutenant Baker shoved him "all the way as he was walking back" to the patrol car and that, because of his fall, he endured "excruciating pain" and had to undergo surgery. *Id.* at 8–9.

Notably, both parties submit video recordings of the incident: (1) Defendants submit the dashcam footage from Officer Jenkins' patrol car (Doc. 30-1) and a video taken by a bystander (Doc. 30-2); and (2) Plaintiff provides Officer Jenkins' bodycam footage of the incident (Doc. 35-3). "[I]t is well established that video recordings are given a presumption of reliability and significant evidentiary weight because '[a]n electronic recording will many times produce a more reliable rendition . . . than will the unaided memory of a police agent.'" *Crandel v. Hall*, 75 F.4th 537, 549 (5th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81, 127 S.Ct. 1769 (2007)). Thus, although the parties provide conflicting renditions of the incident, the Court can rely upon the parties' video recordings to determine, to the extent possible, which rendition of the facts is accurate. *See Bailey v. Ramos*, 125 F.4th 667, 675 (5th Cir. 2025) ("[Courts] are required to view the facts in the light depicted by the videotape. . . . Inasmuch as that video evidence is inconclusive, however, the ordinary summary judgment standard applies.") (citations and internal quotation marks omitted)).

**VIDEO EVIDENCE**

The Court now turns to the contents of the parties' video evidence. Only the video taken by the bystander provides footage from before the other officers arrived to assist Lieutenant Baker. Doc. 30-2. That video begins with Lieutenant Baker in the background placing Plaintiff's son, Bradley Bearden, in handcuffs and standing by a car. *Id.* at 00:01–00:20. A group of four individuals, including Plaintiff's daughter, Lindsey Bearden, stood near Bradley and Lieutenant Baker. *Id.* Lindsey then walked in front of Lieutenant Baker and screamed, either at Lieutenant Baker or another man next to her, "F-ck you!  F-ck you!" *Id.* at 00:28–00:37.

Then, while the rest of the group stayed back with Lieutenant Baker, Lindsey walked towards a woman engaging with Jeffrey Shelton. Doc. 30-2 at 00:40–00:47. As she walked,

4

Lindsey called out, "Mama," and the woman engaging with Shelton turned to Lindsey and explained, "He's laughing at us." *Id.* Plaintiff then approached Shelton, pointed his finger in Shelton's face, and asked, "What are you laughing about? Have you ever had the sh-t knocked out of you? Well, you're d-mn well fixing to." *Id.* at 00:53–01:00. During this interaction, Lieutenant Baker continued to engage with Bradley and the surrounding group of individuals in the background.[4] *Id.* Officers Jenkins and Huddleston arrived at the parking lot while Plaintiff was still interacting with Shelton. *Id.* at 01:10–01:34.

According to the bodycam footage, as Officer Jenkins arrived at the parking lot to assist, Lieutenant Baker walked Bradley towards Officer Jenkins' patrol car to detain him there. Doc. 35-3 at 14:08–14:20. As they passed each other, Lieutenant Baker signaled to Jenkins, "Take her, in the UPS shirt. Right there, in the brown shirt," pointing in the direction of Lindsey, who was wearing a brown UPS shirt and, by that point, speaking with Plaintiff. *Id.* at 14:17–14:29. Officer Jenkins then walked over to Lindsey, placed her in handcuffs, and detained her in the back of his patrol car with Bradley. *Id.* at 14:30–15:30.

As Officer Jenkins placed Lindsey in handcuffs, the bystander video shows Plaintiff starting to walk away from Shelton. Doc. 30-2 at 01:24–01:27. Plaintiff then doubled back and began walking towards Shelton again. *Id.* at 01:27–01:31. Officer Huddleston then approached Plaintiff and separated him from Shelton, walking Plaintiff over to stand next to a parked car. *Id.* at 01:33–01:41. Then, Officer Huddleston turned around to guide Shelton in the opposite direction. *Id.* at 01:41–01:49. A few seconds later, Plaintiff walked toward Officer Huddleston. *Id.* Seeing Plaintiff, Officer Huddleston pointed back towards the car where he had instructed Plaintiff to stand before. *Id.* at 01:49–01:52. Plaintiff shook his head, did not move back towards

---

[4]It is unclear the extent to which Baker overheard Plaintiff's threat to Shelton.

the car, and stated, "This is private property.  I don't care if you are a cop."  Doc. 30-2 at 01:51–01:56.  For the remainder of the bystander video, Plaintiff spoke with Officer Huddleston.  *Id.* at 01:55–02:25.  The video concludes with Plaintiff walking away from Officer Huddleston, in the opposite direction of where Huddleston previously instructed him to stand.  *Id.* at 02:25–02:28.

While Plaintiff interacted with Officer Huddleston, the dashcam footage depicts Officer Jenkins bringing Lindsey over to his patrol car, where Lieutenant Baker stood with Bradley.  Doc. 30-1 at 14:54–15:03.  In the bodycam footage, immediately after the officers placed Lindsey and Bradley in the back of the patrol car, Officer Jenkins asked Lieutenant Baker, "So what do we got?"  Doc. 35-3 at 15:30–15:35.  Lieutenant Baker responded, "I don't even know.  Everybody's yelling and screaming."  *Id.* at 15:35–15:38.  He further explained that Bradley was "getting in people's faces" and motioned to two of the individuals standing in the parking lot as having interfered with Baker's police duties.  *Id.* at 15:38–15:44.  The individuals began arguing with the officers, at which point Officer Jenkins stated, "You need to [abide] by our commands right now until we figure this out."  *Id.* at 15:44–16:00.

The dashcam footage shows that while Officers Jenkins and Baker engaged with the group, Plaintiff walked away from Officer Huddleston and reengaged with Shelton.  Doc. 30-1 at 15:35–15:45.  Officer Huddleston then stepped in between them and began leading Shelton away from Plaintiff.  *Id.* at 15:45–15:50.  While Officer Jenkins stayed back with the group of individuals, Lieutenant Baker approached Plaintiff, placed one hand on Plaintiff's right arm, and pointed away from the crowd with his other hand.  *Id.* at 15:47–15:51.  Lieutenant Baker walked with Plaintiff for a couple of steps, at which point Plaintiff pulled his arm away from Baker, lifted his elbow, and backed away.  *Id.* at 15:50–15:54.  For the second time, Lieutenant Baker approached Plaintiff, pointed in the same direction, and attempted to grab his arm.  *Id.* at 15:53–

15:56–16:00. Again, Plaintiff pulled his arm away, lifted his elbow, and moved away from Lieutenant Baker. *Id*. For the third time, Lieutenant Baker pointed in the same direction. Doc. 30-1 at 15:58–16:00. When Plaintiff did not start moving, Lieutenant Baker pushed Plaintiff in the direction he had instructed him to go and pointed again. *Id.* at 16:03–16:08. Baker then turned around and began walking back towards the crowd, at which point Plaintiff turned around followed Baker, pointing a finger at Baker. *Id.* at 16:08–16:15. Lieutenant Baker turned back, spoke briefly to Plaintiff, and pointed again in the direction he had pointed three times already. *Id*.

Then, the dashcam footage shows that Lieutenant Baker turned away from Plaintiff again to walk back towards the crowd. Doc. 30-1 at 16:14–16:16. As Baker neared the crowd, Plaintiff began walking from his spot back to the crowd. *Id.* at 16:17–16:20. When Lieutenant Baker realized that Plaintiff had made it back to the group, he turned around, pointed back to Plaintiff's spot, and reached for Plaintiff's arm to lead him back. *Id.* at 16:21–16:26. Plaintiff again pulled his arm away and lifted his elbow. *Id.* at 16:26–16:31. Lieutenant Baker reached for Plaintiff's arm again, and Plaintiff pulled it away from him and lifted his elbow, this time turning elbow-first towards Lieutenant Baker. *Id.* As Plaintiff turned, Lieutenant Baker pushed him back in the direction Baker had instructed him to walk. *Id*. The dashcam footage shows Plaintiff fall to the ground and Baker stumble above him. Doc. 30-1 at 16:30–16:31.

The bodycam footage similarly depicts the three instances of Lieutenant Baker instructing Plaintiff to stand away from the crowd. Doc. 35-3 at 16:03–16:23. It also shows that after Plaintiff followed Lieutenant Baker back into the crowd, he told the officers, "This is a private parking lot." *Id.* at 16:25–16:33. Both Lieutenant Baker and Officer Jenkins responded by motioning to where Plaintiff had been instructed to stand and stating, "Go over there." *Id.* at

7

16:32–16:35.  Like the dashcam footage, the bodycam footage shows that Lieutenant Baker began leading Plaintiff back to his spot.  *Id.* at 16:34–16:37.  However, unlike the dashcam footage, the bodycam footage only shows the back of Lieutenant Baker, whose body blocks Plaintiff from view.  *Id.*  The bodycam footage does not show Plaintiff's interactions with Baker on their way to the spot.  *See id.*  From behind, Lieutenant Baker appears to walk with his hands out towards Plaintiff.  Doc. 35-3 at 16:34–16:37.  Then, the video shows Baker quickly moving forward towards Plaintiff and Plaintiff subsequently falling to the ground on the left side of his body.  *Id.* at 16:37–16:41.

By the time Officer Jenkins reached Plaintiff, Lieutenant Baker had rolled Plaintiff onto his stomach, placed his right hand in handcuffs, and was working on securing Plaintiff's left hand, which was still pinned under Plaintiff's body.  Doc. 35-3 at 16:41–16:45.  Officer Jenkins instructed Plaintiff, "Get your hands behind your back," and when Plaintiff did not respond, Officer Jenkins reiterated, "Hands behind your back!"  *Id.* at 16:45–16:48.  The officers successfully pulled Plaintiff's left arm out from under his body and placed his left hand into the handcuffs.  *Id.* at 16:48–16:58.  As they worked to get Plaintiff up off the ground, Plaintiff communicated that he was in pain and appeared to be bleeding from his left arm.  *Id.* at 16:58–17:15.

## LEGAL STANDARD

### I. Summary Judgment Standard

The Court may only grant a motion for summary judgment when there is no genuine dispute of material fact and the moving party is entitled to summary judgment as a matter of law. FED. R. CIV. P. 56(a).  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

8

477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A "material fact" is one that might affect the outcome of the suit under governing law.  *Id*.  The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  The movant's burden is only to point out the absence of evidence supporting the nonmovant's case. *Stults v. Conoco, Inc*., 76 F.3d 651, 655 (5th Cir. 1996).  Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial.  *Id*.  All facts and inferences are viewed "in the light most favorable to the nonmoving party."  *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).  "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence."  *Id*.

## II.    Qualified Immunity Standard

Lieutenant Baker asserts the affirmative defense of qualified immunity.  Qualified immunity is intended to shield government officials from liability for monetary damages for acts in the performance of discretionary functions that were objectively reasonable in light of clearly established law.  *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 2738 (1982); *Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir. 2001).  Qualified immunity is "an immunity from suit

9

rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).

A good faith assertion of qualified immunity alters the usual summary judgment burden of proof, such that "the burden shifts to the plaintiff to show that the defense is not available." *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (citing *Kovacic v. Villareal*, 628 F.3d 209, 211 (5th Cir. 2010)).  In other words, the plaintiff "bears the burden of showing a genuine and material dispute as to whether the official is entitled to qualified immunity." *Id.* (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).  "The basic steps of our qualified-immunity inquiry are well-known: a plaintiff seeking to defeat qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Id.* at 377 (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc)).  In its discretion, the Court may determine which prong to evaluate first "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818 (2009).

A plaintiff seeking to defeat qualified immunity must show that the official violated a statutory or constitutional right and that the right was clearly established at the time of the challenged conduct. *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc); *see also, McCreary v. Richardson*, 738 F.3d 651, 656 (5th Cir. 2013) (per curiam).  "To find that a right is clearly established, courts generally 'need to identify a case where an officer acting under similar circumstances . . . was held to have violated' the Constitution." *Zorn v. Linton*, 607 U.S. ___, 146 S.Ct. 926, 930 (2026) (*per curiam*) (quoting *Escondido v. Emmons*, 586 U.S. 38, 43, 139 S.Ct. 500, 202 L.Ed.2d 455 (2019) (*per curiam*) (internal quotation marks omitted)).  "The relevant precedent must define the right" with such a "'high degree of specificity'" that an officer "could

10

have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct." *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018) (internal quotation marks omitted) and *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015)).

## ANALYSIS

As stated, the burden is on Plaintiff to show that the qualified immunity defense is not available to Lieutenant Baker.  To do so, Plaintiff must establish: (1) that Lieutenant Baker used excessive force against him in violation of the Fourth Amendment; and (2) that relevant, highly specific precedent demonstrates that Lieutenant Baker's conduct was unlawful.  *Zorn v. Linton*, 607 U.S. ___, 146 S.Ct. 926, 930 (2026) (*per curiam*).  The Court first considers whether Lieutenant Baker used excessive force.

### I.        Whether Lieutenant Baker used excessive force

Excessive force that violates the Fourth Amendment requires showing: "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Buchanan v. Gulfport Police Dep't*, 530 Fed. App'x 307, 312 (5th Cir. 2013) (quoting *Ikerd v. Blair*, 101 F.3d 430, 433–34 (5th Cir. 1996)).  A Court must "adopt the perspective of a reasonable officer on the scene, rather than judge with [a] vision of hindsight." *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quotation omitted).  The inquiry is "whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Id*.

To prove the first element of an excessive use of force claim, a plaintiff must show he "suffered some injury," and "even relatively insignificant injuries and purely psychological

11

injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Bagley v. Guillen*, 90 F.4th 799, 804 (5th Cir. 2024) (citations and internal quotation marks omitted).   In an affidavit submitted with Defendants' motion, Officer Jenkins stated that after Plaintiff's fall, "[w]hen [the officers] lifted Bearden to a sitting position, [Jenkins] observed that [Bearden] had blood on his arm, which appeared to be from a scrape."   The bodycam footage confirms that Plaintiff was bleeding from his left arm when the officers lifted him to a sitting position.   Doc. 35-3 at 16:58–17:15.   With his response, Plaintiff provided his deposition testimony that he went into the emergency room a few days after the incident for "excruciating pain"; received an X-ray; and learned that the leads in his back stimulator had been dislodged such that he was no longer receiving the benefits of the stimulator.   Doc. 35 at 9; Doc. 35-1 at 60:11–17, 62:9–13.   The summary judgment evidence establishes, and Defendants do not contest, that Plaintiff suffered a constitutionally cognizable injury when he fell on the ground.

Defendants also do not contest that Lieutenant Baker used force against Plaintiff when he pushed him.   Doc. 30 at 2.   Defendants do, however, contest Plaintiff's characterization of the use of force as "excessive" and "unreasonable."   *Id.* at 12–14, 21–25.   In the context of excessive force before or during an arrest, the Supreme Court has identified the following factors to consider when applying the objective-reasonableness standard: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."   *Graham v. Connor*, 490 U.S. 386, 396 (1989).

### a.  Severity of the Crime at Issue

Concerning the first factor, Defendants assert in their motion that the crime at issue was interference with public duties, which they concede is typically considered a minor crime.   Doc.

12

30 at 22–23.  Nonetheless, they argue that "under the totality of the circumstances," this factor should favor Lieutenant Baker, because he "was involved in an attempt to prevent physical violence from breaking out."  *Id.* at 23.  However, Defendants do not cite, and the Court is not aware of, any authority suggesting that interference is a more severe crime when the officer's public duty involves preventing physical violence.  *See* TEX. PENAL CODE § 38.15 (which generally criminalizes, "with criminal negligence[,] . . . interfer[ing] with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law," and provides that such an offense "is a Class B Misdemeanor"); *see also*, *Westfall v. Luna*, 903 F.3d 534, 547–48 (5th Cir. 2018) (classifying a violation of Section 38.15 as a "minor offense" for purposes of the first *Graham* factor).

Although Plaintiff seems to imply in his response that no crime was at issue, "because no arrest had been announced before force was used," the summary judgment evidence supports that Plaintiff's interference with public duties was in fact at issue.  Doc. 35 at 15.  Specifically, the video evidence demonstrates that Plaintiff, multiple times before the use of force, failed to comply with Lieutenant Baker's instructions to stand in a particular spot away from the group.  Doc. 30-1 at 15:47–16:15; Doc. 35-3 at 16:03–16:23; *see also, Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) ("Texas courts have found that failure to comply with an officer's instructions . . . violates Texas Penal Code § 38.15[.]  Specifically, several courts have affirmed convictions of defendants who failed to comply with an officer's instruction to move away from a crime scene." (citations omitted) (collecting cases)).  Even where a plaintiff has not been formally arrested, failure to comply with an officer's orders may still justify the use of some force.  *See, e.g., Craig v. Martin*, 49 F.4th 404, 412 (5th Cir. 2022) ("Physical force may be necessary to ensure compliance when a suspect 'refus[es] to comply with instructions.'" (quoting *Deville v. Marcantel*,

567 F.3d 156, 167 (5th Cir. 2009))).  Thus, although this factor favors Plaintiff, as the crime at issue is minor, the Court will consider the nature of Plaintiff's conduct in connection with the other *Graham* factors.

### b.  Immediate Threat to the Safety of the Officers or Others

Turning to the second factor, Defendants argue that Lieutenant Baker reasonably believed Plaintiff posed a threat to him, because Plaintiff had been "angry, combative, and openly threaten[ing]" leading up to the use of force.  Doc. 30 at 23.  In his response, Plaintiff argues that there is a genuine dispute as to whether he posed an immediate threat to Lieutenant Baker.  Doc. 35 at 15–16.  Plaintiff argues that the summary judgment evidence establishes that Plaintiff never threatened any of the officers; that the officers did not know Plaintiff was armed leading up to the use of force[5]; that Plaintiff had not assaulted anyone; and that Plaintiff had not attempted to flee.[6] *Id.* at 16.

In evaluating the *Graham* factors, the Court must consider the facts as they would have appeared to a reasonable police officer.  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").  Here, the video evidence depicts Lieutenant Baker, facing in Plaintiff's direction as Plaintiff approaches and faces off with Jeffrey Shelton.  Doc. 30-1 at 15:35–15:51.  Officer Huddleston then stepped in between Plaintiff and Shelton to separate them and escorted Shelton away from Plaintiff.  *Id*.  Witnessing this exchange, a reasonable officer could have believed that Plaintiff was attempting to engage in a

---

[5]Immediately after the officers handcuffed Plaintiff and while he was still on the ground, Officer Huddleston confiscated a black handgun which had been holstered on Plaintiff's hip.  The officers testified that they did not know Plaintiff was armed before handcuffing him.

[6]Although Plaintiff raises this argument in support of the second *Graham* factor, whether Plaintiff attempted to flee bears on the third factor, *i.e.*, "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

physical fight with Shelton and was therefore a "threat to the safety of the officers or others." *Graham*, 490 U.S. at 396.

Lieutenant Baker did not, however, use force upon witnessing Plaintiff's confrontation with Shelton.  Instead, Lieutenant Baker approached Plaintiff and attempted to escort Plaintiff in the opposite direction of Shelton and away from the crowd.  Doc. 30-1 at 15:47–15:51.  Though there is no clear audio of the interactions between Baker and Plaintiff, the dashcam footage depicts Plaintiff repeatedly pulling his arm away from Baker and moving away, while Baker tries to escort Plaintiff to a particular spot away from the crowd.  *Id.* at 15:47–16:00.  Although Baker placed his hand on Plaintiff's arm to guide him, Baker did not use any force while initially escorting Plaintiff. *Id.*

When Plaintiff failed to comply with Lieutenant Baker's instructions for a third time, Baker gave Plaintiff a small push back towards the designated spot.  Doc. 30-1 at 16:03–16:08.  When Plaintiff finally reached the designated spot, Baker began to walk back towards the crowd.  *Id.* at 16:00–16:03.  Plaintiff immediately tried to follow Baker, who turned and pointed to the spot once more, before turning back towards the crowd.  *Id.* at 16:08–16:15.  After remaining in the spot long enough for Baker to reach the crowd, Plaintiff began approaching the crowd again.  *Id.* at 16:17–16:20.  Seeing Plaintiff, Lieutenant Baker and Officer Jenkins both verbally instructed Plaintiff to move back to the designated spot, while Baker walked towards Plaintiff to, again, escort him back to the spot.  *Id.* at 16:21–16:26; Doc. 35-3 at 16:32–16:37.  The dashcam footage shows that Plaintiff continued to pull away from Baker and, ultimately, turned quickly towards Baker with his elbow up.  Doc. 30-1 at 16:26–16:31.  Even if, as Plaintiff suggests, he never intended to elbow Baker in the face, Baker could have reasonably believed Plaintiff was attempting to elbow him, based on Plaintiff's body language.  Doc. 30-3 at 27:7 (Baker's deposition testimony that

15

"[Plaintiff] swung his elbow at [Baker]"); Doc. 35-5 at ¶ 12 (Plaintiff's affidavit testimony that "[he] never attempted to strike [Baker]").  In other words, Baker could have reasonably believed that Plaintiff posed an immediate threat to his safety, which justifies Baker pushing Plaintiff away from him.  This is true, regardless of whether Plaintiff had threatened or assaulted anyone prior; was known to have a gun in his possession; or was actively fleeing from Baker.  Accordingly, this factor favors Baker.

### c.  Actively Resisting Arrest or Attempting to Evade Arrest by Flight

The third and final *Graham* factor looks at "whether [the plaintiff] is actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The Fifth Circuit, in *Anderson v. Estrada*, clarified that this factor, "in sum, concerns the degree of resistance to the officer's *objective*."  140 F.4th 634, 645 (5th Cir. 2025) (emphasis in original). Here, as noted by Plaintiff, no formal arrest had been made or announced at the time Lieutenant Baker pushed Plaintiff, so Plaintiff was not necessarily resisting or evading arrest.  Doc. 35 at 2. However, as stated, the video evidence shows that Plaintiff resisted each of Baker's multiple commands leading up to the use of force, thereby frustrating Baker's objective of separating Plaintiff from the crowd.  Doc. 30-1 at 15:47–16:00; *see Anderson*, 140 F.4th at 636 ("Repeated attempts to withdraw from an officer or declining to follow an officer's orders constitute active resistance." (citing *Betts v. Brennan*, 22 F.4th 577, 584 (5th Cir. 2022))).  Thus, this factor favors Baker.

In view of the *Graham* factors, the Court concludes that Baker's use of force was neither excessive nor objectively unreasonable in violation of the Fourth Amendment.  Even though the crime at issue was minor, Plaintiff had actively resisted Lieutenant Baker's commands and ultimately turned towards Baker elbow-first in such a way that Baker could have reasonably

believed Plaintiff was about to strike him.  The amount of force Lieutenant Baker used to push Plaintiff did not exceed the need for force created by these circumstances.  Accordingly, Baker did not violate the Fourth Amendment by pushing Plaintiff.

## II.        Whether Lieutenant Baker is entitled to qualified immunity

Even if Lieutenant Baker had violated Plaintiff's Fourth Amendment rights when he pushed him, Plaintiff did not meet his burden to demonstrate that such a right was clearly established at the time Lieutenant Baker used such force.  Specifically, Plaintiff did not identify any relevant precedent clearly establishing that the push Lieutenant Baker gave Plaintiff, under these or sufficiently similar circumstances, would amount to excessive force.  Instead, Plaintiff relies upon *Bush v. Strain*[7], in which the Fifth Circuit "held that it was clearly established that officers could not 'forcibly slam[]' a 'handcuffed and subdued' individual's face 'into a nearby vehicle' when the individual 'was not resisting arrest or attempting to flee.'"  *Bailey v. Ramos*, 125 F.4th 667 (5th Cir. 2025) (quoting and summarizing *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)); Doc. 35 at 23.

The circumstances in *Bush* differ substantially from the circumstances here.  Unlike Bush, Plaintiff was not handcuffed or otherwise subdued when Lieutenant Baker used force against him. Further, the degree of force employed by Lieutenant Baker was much lower than in *Bush*.  Instead of forcefully slamming Plaintiff's face into a car, Baker pushed Plaintiff in the back.  And although Plaintiff was not specifically resisting arrest, he was resisting Lieutenant Baker's commands leading up to the use of force.  In sum, the holding in *Bush* does not clearly establish that Lieutenant Baker's use of force here violates Plaintiff's Fourth Amendment rights.  Plaintiff does not identify, and the Court is not aware of, any other authority demonstrating that Lieutenant Baker's use of

---

[7]513 F.3d 492 (5th Cir. 2008).

force amounts to a clearly established violation of the Fourth Amendment.  Therefore, Lieutenant Baker is entitled to qualified immunity.

### CONCLUSION

There are no genuine issues of material fact in this case.  Defendants are entitled to judgment as a matter of law.  It is therefore

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. 30) is **GRANTED** and Plaintiff's claims are **DISMISSED with prejudice**.

So ORDERED and SIGNED this 14th day of July, 2026.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

18